IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 14, 2004

## STATE OF TENNESSEE v. SPENCER PETERSON

**Appeal from the Criminal Court for Shelby County**
**Nos. 01-04380-04392     John P. Colton, Jr., Judge**

———————————

**No. W2003-02939-CCA-R3-CD  - Filed December 6, 2004**

———————————

Based on his participation in a home invasion and robbery that resulted in the death of a victim, the defendant, Spencer Peterson, was charged by the Shelby County Grand Jury in thirteen separate indictments with one count of first degree premeditated murder; two counts of first degree felony murder; two counts of attempted first degree murder; eight counts of aggravated robbery; one count of aggravated burglary; three counts of attempted especially aggravated robbery; and two counts of attempted aggravated robbery.  The indictments were consolidated for trial, at the conclusion of which the defendant was convicted of all counts as charged with the exception of the first degree murder and attempted first degree murder counts, in which he was convicted, respectively, of the lesser-included offenses of second degree murder, a Class A felony; and attempted second degree murder, a Class B felony.  After merging the three second degree murder convictions and the separate convictions of aggravated robbery involving the same victim, the trial court sentenced the defendant as a Range I offender to consecutive terms of twenty years for the second degree murder conviction and eight years for each of the four aggravated robbery convictions.  The trial court ordered concurrent sentences for the remaining convictions, for an effective sentence of fifty-two years in the Department of Correction.  On appeal, the defendant challenges the sufficiency of the evidence for his second degree murder conviction; the denial of his motion to suppress his statement to police; the admission at trial of photographs of the victim; the propriety of the jurors having been allowed to directly question trial witnesses; and the consecutive sentencing imposed.  We affirm the judgments of the trial court but remand for entry of corrected judgments as to certain of the offenses and for the trial court to set out its basis for consecutive sentencing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded**

ALAN E. GLENN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA MCGEE OGLE, J., joined.

Kevin E. Childress, Memphis, Tennessee (on appeal), and Brett Stein, Memphis, Tennessee (at trial), for the appellant, Spencer Peterson.

Paul G. Summers, Attorney General and Reporter; Michael Markham, Assistant Attorney General; William L. Gibbons, District Attorney General; and Paul Thomas Hoover, Jr., and Michael S. Davis, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

At approximately 8:00 p.m. on September 29, 2000, nine Hispanic men were in a Memphis apartment when two masked African-American men entered through the cracked door. One was armed with a pistol and demanded money, while the second remained by the door to prevent anyone from leaving. During the course of the robbery, the gunman shot one victim in the leg, a second victim in the arm, and a third victim in the chest, causing his death. Acting on a tip, the police arrested the defendant two days later and brought him to the homicide office, where he admitted participating in the robbery and sharing in the proceeds, but denied that he shot anyone or had any prior knowledge of his accomplice's intention to fire his weapon.

Prior to trial, the defendant filed a motion to suppress his statement, arguing, among other things, that it was the product of an unlawful detention and was neither knowingly nor voluntarily given. The sole witness at the November 29, 2001, suppression hearing was Sergeant James L. Fitzpatrick, one of two Memphis police officers who participated in recording the statement. Sergeant Fitzpatrick identified the defendant's signed waiver of rights and his statement, which were admitted as exhibits to the hearing. He testified that police investigators who "saturated the area" immediately after the crime located three or four separate witnesses who, based on details the defendant had leaked in conversation, identified the defendant and his codefendant as the perpetrators of the crime. As a result of that information, police officers were actively searching for the defendant for at least two days prior to his arrest.

Sergeant Fitzpatrick testified the defendant was arrested on October 2, 2000, at approximately 6:00 p.m. and brought to the homicide office at about 6:30 p.m. He said he and Sergeant Sheffield read the defendant his rights at 8:43 p.m., obtained his signed waiver of rights at 8:45 p.m., began taking his formal statement at 9:33 p.m., and completed the written statement, initialed and signed by the defendant, at 10:36 p.m. The defendant was under arrest at the time the statement was taken, but was not formally charged until shortly thereafter. Sergeant Fitzpatrick stated that the purpose of the interview was to give the defendant a chance to either confirm or refute the information the police had obtained from their witnesses. He agreed there was sufficient probable cause for the defendant's arrest and testified that the defendant would have been charged regardless of whether or not he gave a statement.

The trial court subsequently overruled the motion to suppress, and the defendant was tried before a Shelby County Criminal Court jury from May 12-15, 2003. Memphis Police Officer Adrienne Dobbins testified she was patrolling with her partner in the Hickory Hill area of Memphis between 8:00 and 8:30 p.m. on September 29, 2000, when she received a report of a home invasion

robbery with three gunshot victims at the Marina Cove Apartments. Upon entering the apartment, she observed blood spattered on the carpet, the three gunshot victims, and several other individuals. Officer Dobbins testified that one of those individuals who spoke English related that he and the others had been inside the apartment when two masked African-American men entered with a pistol, demanded money from everyone, shot three victims, and fled.

In a reiteration of his suppression hearing testimony, Sergeant Fitzpatrick testified that the defendant was arrested at approximately 6:00 p.m. on October 2, 2000, and brought to the homicide office, where Sergeant Fitzpatrick was asked to participate in his interview. After first familiarizing himself with the case, he advised the defendant of his rights and obtained a written waiver at 8:45 p.m., began taking the defendant's statement at 9:30 p.m., and completed the written statement at 10:36 p.m., which the defendant signed and initialed in his presence. On cross-examination, Sergeant Fitzpatrick acknowledged that the defendant turned eighteen on October 1, 2000, the day before his October 2 statement was taken, and had therefore still been a juvenile on September 29, 2000, when the crimes were committed.

In the statement, which Sergeant Fitzpatrick read aloud for the jury and which was admitted as a trial exhibit, the defendant said that he and "Tweety"[1] had decided to rob someone two or three days before the incident occurred and that Tweety had obtained a gun from "Twin." He stated that they chose the victims' apartment because the door was cracked open, that they entered together, and that Tweety demanded money while displaying the gun. According to the defendant, Tweety reacted with violence when the victims were initially slow to produce their money:

> He shot at one of the guy's leg, and I didn't know that he had shot him at first until I saw him grab his leg. I was standing by the door. I did not leave the door, but I saw after the guy got shot in the leg, they put the money on the table.
>
> I seen [sic] the second one get shot, but I don't know if it was before or after the money was put on the table. I saw the second one go down holding his arm after the shot.
>
> Tweety got the money off the table went in another room, and I couldn't see him. I heard more gunshots, either one or two, and then Tweety came back from the other room, and we ran out the door.
>
> We ran by the pool and dropped our clothes, and we had some clothes up under the clothes that we dropped. After that, we went back up front of the apartment complex by Twin's house and acted like we didn't know what happened.

---

[1]From the statements of counsel and the trial court, it appears that the codefendant, Darius Jones, was tried separately and convicted, *inter alia*, of first degree felony murder.

The defendant stated that he received half of the $500 robbery proceeds. He said he was not armed, did not know that Tweety was going to shoot anyone, and had thought that all Tweety intended to do was to "show the gun and get the money."

The State's next witness, Hector Moreno, testified through an interpreter that he and three friends were talking and playing cards in the living room when two masked African-American men dressed in black entered the apartment. He said that the taller of the two was armed with a gun and demanded their money, while the shorter man remained by the door to prevent anyone from leaving. The gunman took the money from the table where Moreno and his friends had been playing cards, and shot Moreno in the right hand as he was reaching for his wallet. Moreno testified that the gunman shot "Pablo" in the leg a few minutes later. He said that the gunman went into the kitchen and he could hear him asking for money from the men there, but he did not hear any gunshots. While the gunman was in the kitchen, the masked man who remained in the living room beside the door ordered Moreno, in a "[v]ery mad" tone of voice, to take off his shoes so he could see if he had any money hidden inside them. Moreno testified that before leaving, the gunman shot "Armondo" in the chest, and Armondo later died from his injury. He acknowledged that the man who remained beside the door did not have a gun. However, he testified that the man was still waiting at the door for his accomplice at the time Armondo was shot and that the two men appeared to flee the apartment together. Moreno identified a photograph of Armondo Becerra while he was alive, which was admitted as a trial exhibit over defense counsel's objection, and another "morgue photograph" of Becerra, which was admitted for identification only.

Enrique Diaz[2] testified through an interpreter that five men were in the kitchen and he and three others were playing cards in the living room when two masked African-American men, one armed with a gun, rushed in. While the shorter man remained by the front door to block anyone from leaving, the gunman took their money from the card table; demanded more money from Hector Moreno and shot him when he said he did not have any; took the $400 Diaz had in his wallet; shot Pablo Alvarado in the leg when he and Armondo Becerra said they did not have any more money; went into the kitchen pointing his gun; came back from the kitchen; started out the apartment door after the second man; turned and shot Armondo Becerra; and then left the apartment, closing the door as he left. Diaz estimated that the gunman left twenty seconds after his companion, or "[j]ust the time that he shoot somebody else[.]" He said that the second man who blocked the door did not make any statements or threatening motions, but that he was afraid of him. He acknowledged he had speculated in his statement to police that the second man "must have been the lookout."

The State's next two witnesses, Carlos Diaz Ponce and Hector Martinez, were among the group of five men in the kitchen. Ponce testified through an interpreter that he started toward the living room from the kitchen, saw the gunman, and returned to the kitchen to inform his friends. He said that the men in the kitchen were attempting to hide their wallets in the trash and in the refrigerator when they heard two gunshots from the living room. The gunman then entered the

---

[2] Although this witness was called to the stand by the name "Enrique Diaz Castello," he testified that "Castello" was his mother's maiden name and that he went by "Diaz," his father's last name.

kitchen and took money from three of them, excluding Ponce and Martinez because neither had any money. Ponce said he heard a third and final shot after the gunman had left the kitchen. Martinez, who also testified through an interpreter, corroborated Ponce's account, testifying that he heard two gunshots from the living room before a masked gunman came into the kitchen and demanded money from the five men there, took money from the three that had money, and then left. Martinez also heard a third gunshot from the living room just before the gunman left the apartment. From their positions in the kitchen, neither Ponce nor Martinez was able to see the shootings or the man who stood guard at the front door.

Dr. Teresa Allen Campbell, the Shelby County medical examiner who performed the autopsy of Armondo Becerra's body, testified that he died as the result of a gunshot wound to the left lower chest in which the bullet entered the abdomen and lacerated the liver, causing him to bleed to death. She identified the morgue photograph of Becerra as the man on whom she had performed the autopsy, which was then admitted as a trial exhibit.

Alfonso Enrique Becerra, Armondo Becerra's brother, testified through an interpreter that he was between the kitchen and the living room when the two intruders entered. He said that the one with the gun demanded and took money from the men in the living room, shot two people, came into the kitchen and took money from two or three men, returned to the living room and, just before leaving the apartment, shot his brother, who was sitting on a couch beside the door. The witness testified that the second man remained beside the door and that both men departed together after the gunman shot his brother. He acknowledged that the second man was unarmed and that he never heard him say anything.

The State's final witness was Memphis Police Officer Ricky Davison of the Crime Response Unit, who identified several photographs of the apartment and a sketch he had drawn of the floor plan, which showed that the apartment's front door was visible from the kitchen doorway.

The defendant elected not to testify and rested his case without presenting any proof.

## ANALYSIS

### I. Sufficiency of Evidence for Second Degree Murder Conviction

As his first issue, the defendant challenges the sufficiency of the evidence in support of his conviction for second degree murder. When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All

questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of second degree murder under a theory of criminal responsibility. Second degree murder is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a) (1997 & 2003). "'Knowing' refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[.]" Id. § 39-11-106(20). A person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Id. § 39-11-402(2). Criminal responsibility is not a separate crime but "is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999).

Relying on State v. Howard, 30 S.W.3d 271 (Tenn. 2000), the defendant argues that the State failed to prove him guilty of second degree murder under a theory of criminal responsibility because it failed to show beyond a reasonable doubt that the victim's death was the natural and probable consequence of the aggravated robberies or aggravated burglary. In support, he cites the testimony that he did not possess a gun and left the apartment before the shooting occurred, as well as his statement to police, in which he disavowed any prior knowledge of his accomplice's intention to use his weapon.

In Howard, our supreme court set forth what the State must prove beyond a reasonable doubt in order to impose criminal liability based on the natural and probable consequences rule: "(1) the

elements of the crime or crimes that accompanied the target crime; (2) that the defendant was criminally responsible pursuant to Tennessee Code Annotated section 39-11-402; and (3) that the other crimes that were committed were natural and probable consequences of the target crime." Id. at 276. The defendant in Howard was convicted of premeditated murder based on a killing committed by a codefendant during a robbery. Here, the defendant was convicted of one count of second degree murder as a lesser-included offense of premeditated murder and two counts of second degree murder as lesser-included offenses of felony murder, with the three separate counts merged into a single conviction following the jury's verdicts. This court has previously concluded that when a defendant's conviction occurs under a theory of criminal responsibility for felony murder, the natural and probable consequences rule is not implicated. See State v. Robert Simerly, No. E2002-02626-CCA-R3-CD, 2004 WL 443294, at *11 (Tenn. Crim. App. Mar. 11, 2004), perm. to appeal denied (Tenn. Oct. 4, 2004) ("Thus, the evidence that places the defendant squarely in the robbery enterprise inculpates him through complicity in the felony murder.") (citing State v. Winters, 137 S.W.3d 641, 658-59 (Tenn. Crim. App. 2003), perm. to appeal denied (Tenn. 2004)); State v. Gene Shelton Rucker, Jr., No. E2002-02101-CCA-R3-CD, 2003 WL 22999411, at * 7 (Tenn. Crim. App. Dec. 22, 2003) ("[W]e adhere to the . . . view . . . that the natural and probable consequences instruction is not required in conjunction with a charge of felony murder.").

The Winters court provided the rationale for this determination:

> The question whether the natural and probable consequences instruction was required for the felony murder count is an intriguing one. "The [natural and probable consequences] rule underlies the doctrine of criminal responsibility and is based on the recognition that aiders and abettors should be responsible for the criminal harms they have naturally, probably and foreseeably put into motion." Howard, 30 S.W.3d at 276. In contrast, the felony murder statute, both as it existed at the time of the crime and today, does not require that a homicide committed during the course of one of the enumerated felonies be foreseeable. See Tenn. Code Ann. § 39-13-202(a)(2) (1997 & 2003); State v. Hinton, 42 S.W.3d 113, 119 (Tenn. Crim. App. 2000), perm. app. denied (Tenn. 2001). "When one enters into a scheme with another to commit one of the felonies enumerated in the felony murder statutes, and death ensues, both defendants are responsible for the death regardless of who actually committed the murder and whether the killing was specifically contemplated by the other." Id. (citing State v. Brown, 756 S.W.2d 700, 704 (Tenn. Crim. App. 1988)). Thus, the defendant in the case before us was statutorily responsible for *all homicides* committed during the course of the robbery, whether or not the homicide was foreseeable. As such, despite the state's concession that the instruction should have been given, the trial court was not required to give the natural and probable consequences instruction for the felony murder count.

137 S.W.3d at 659 (emphasis in original). Therefore, the State was not required in this case to show that the murder was a natural and probable consequence of the aggravated robberies or aggravated burglary in order to prove the defendant's guilt of second degree murder under the two felony murder counts of the indictment.

Viewed in the light most favorable to the State, the evidence at trial was more than sufficient to sustain the defendant's second degree murder conviction under a theory of criminal responsibility. Under the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred. See State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). No particular act need be shown, and the defendant need not have taken a physical part in the crime. See id. According to the defendant's own statement, he and his accomplice formulated the plan for the robbery at least two days prior to carrying it out, and his accomplice obtained a gun for that purpose. The defendant also said that he entered the apartment with his accomplice, remained beside the front door during the robbery and fled the apartment with his accomplice after the gunshots had been fired. In addition, he admitted sharing equally in the robbery proceeds. Two out of three victims who saw the defendant described his actions in standing beside the door as blocking anyone's escape. Two of these three witnesses also testified that he fled the apartment with his accomplice after Armondo Becerra had been shot. Finally, one of the victims described the defendant's ordering him to remove his shoes so that he could see if any money was concealed inside them, while the gunman was robbing the victims in the kitchen. From this evidence, the jury could reasonably have concluded that the defendant shared in his accomplice's intent to commit the burglary and robberies and assisted him in the commission of the offenses.

## II. Denial of Motion to Suppress Statement

The defendant next contends that the trial court erred by denying his motion to suppress his statement. The findings of fact made by a trial court on a motion to suppress are binding on this court unless the evidence preponderates against them. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001), cert. denied, 534 U.S. 948, 122 S. Ct. 341, 151 L. Ed. 2d 258 (2001). However, the trial court's application of the law to the facts is reviewed *de novo*. Id.

At the outset, we note that the record contains neither the oral nor written findings of fact and conclusions of law of the trial court on the suppression issue. Thus, although certain findings and conclusions are implicit in the trial court's overruling of the motion, we must review this issue without benefit of the specific findings of fact and conclusions of law. In so doing, we note that the prevailing party, in this case, the State, is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from it. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001). Additionally, this court may consider the proof at trial, as well as at the suppression hearing, when considering the appropriateness of the trial court's ruling on a pretrial motion to suppress. See State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998) (holding that because the rules of appellate procedure "contemplate that allegations of error should be evaluated in light

of the entire record," an appellate court "may consider the proof adduced both at the suppression hearing and at trial").

The defendant first cites State v. Huddleston, 924 S.W.2d 666, 674 (Tenn. 1996), to argue that his statement should be suppressed under the "fruit of the poisonous tree" doctrine as the product of an unlawful detention, asserting that he was unlawfully "held in custody for the sole and express purpose of securing a confession[.]" The State argues that Huddleston is readily distinguishable on its facts and that no Fourth Amendment violation occurred in the case at bar. We agree with the State.

The defendant in Huddleston was arrested without a warrant on a Friday afternoon and held without a judicial determination of probable cause before issuing a confession, preceded by Miranda warnings and a signed waiver of rights, on the following Monday afternoon. 924 S.W.2d at 668. The next day, relying solely on the defendant's confession, a police detective obtained a probable cause warrant from a magistrate. Id. The State conceded that the more than seventy-two-hour detention preceding the judicial probable cause determination constituted an unreasonable delay and hence a Fourth Amendment violation, but argued that suppression of the confession was not the proper remedy for the constitutional violation. Id. at 672. In its determination of that issue, our supreme court adopted the "fruit of the poisonous tree" analysis, in which the "focus is on whether the evidence was obtained by exploitation of the Fourth Amendment illegality." Id. at 674.

Unlike the defendant in Huddleston, the defendant in the case at bar was detained a mere four hours before being formally charged. As the Huddleston court noted, a judicial determination of probable cause that occurs within forty-eight hours of a defendant's arrest is generally sufficient to satisfy the Fourth Amendment, unless there is evidence that the probable cause determination was unreasonably delayed for the purpose of gathering additional information to justify an arrest, was motivated by ill will toward the defendant, or constituted a "'delay for delay's sake.'" Id. at 672 (quoting County of Riverside v. McLaughlin, 500 U.S. 44, 56, 111 S. Ct. 1661, 1670, 114 L. Ed. 2d 49, 63 (1991)).

Although the defendant asserts in his brief that the police "lacked sufficient probable cause to detain him," the evidence presented at the suppression hearing established otherwise. Sergeant Fitzpatrick testified that at least three individuals had identified the defendant as one of the perpetrators, based on information the defendant had provided to them in conversation; that the purpose of the interview was merely to give the defendant a chance to either refute or admit that information; and that the defendant was going to be charged regardless of the outcome of the interview. His testimony further established that the defendant executed his waiver of rights at 8:45 p.m., less than three hours after his arrest, began his formal statement at 9:33 p.m., and signed the written statement at 10:36 p.m. Moreover, Sergeant Fitzpatrick provided a partial explanation for the delay between the defendant's 6:30 p.m. arrival at the homicide office and the 8:43 p.m. initiation of his interview. He explained at trial that he was asked to participate in the interview, even though he had not been involved in the investigation of the crime, because of the timing of the defendant's arrest and arrival at the homicide office. As a result, he had had to take some time to familiarize

himself with the case before beginning the interview. In sum, there is nothing in the record to suggest that the police lacked probable cause to arrest the defendant or detained him without probable cause for the sole purpose of extracting his confession. We conclude, therefore, that there is no Fourth Amendment violation in this case that requires suppression of the defendant's statement.

The defendant additionally argues that his statement should have been suppressed because it was not knowingly and voluntarily made under the totality of the circumstances, in which he had just turned eighteen, was detained for four hours without being charged, and was interviewed without the presence of his parent or a lawyer. The State responds by noting that the defendant was an adult, was held for only a little over two hours before being advised of his rights and signing a waiver of rights form, and presented no evidence at the suppression hearing to show he was unable to make a knowing and intelligent waiver of his right to remain silent or to have counsel present during questioning. The State argues, therefore, that the evidence preponderates in favor of the trial court's denial of the defendant's motion to suppress.

In Miranda v. Arizona, 384 U.S. 436, 471-75, 86 S. Ct. 1602, 1626-28, 16 L. Ed. 2d 694 (1966), the United States Supreme Court held that a defendant's statements made during a custodial interrogation are inadmissible at trial unless the State establishes that the defendant was informed of his right to remain silent and his right to counsel and that he knowingly and voluntarily waived those rights. Whether the defendant made a voluntary, knowing, and intelligent waiver of those rights depends "'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" Edwards v. Arizona, 451 U.S. 477, 482, 101 S. Ct. 1880, 1884, 68 L. Ed. 2d 378 (1981) (quoting Johnson v. Zerbst, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023, 82 L. Ed. 1461 (1938)).

We agree with the State that there is nothing in the record to support the defendant's contention that his confession was unknowing and involuntary. The evidence established that he was legally an adult at the time of the statement, was detained for less than three hours before the interview began, and was given Miranda warnings in the waiver of rights and again before making his statement. The waiver of rights form and the statement show that he signed the waiver of rights and initialed the statement to indicate he understood his rights and wished to talk to the investigators without the presence of an attorney, and also signed his name to the end of the statement and placed his initials at the bottom of each page. Moreover, the biographical information provided at the top of the statement, which we presume was supplied by the defendant, lists his "employment" as an eleventh grade student at Wooddale High School. As such, the evidence preponderates in favor of a finding that his statement was knowing and voluntary. We, therefore, conclude that the trial court did not err in overruling the defendant's motion to suppress his statement.

### III. Admission of Photographs of the Victim

As his next issue, the defendant contends that the trial court erred by admitting the photographs showing the victim alive and deceased. He argues that neither photograph was relevant to any disputed issue at trial and, further, that any probative value the photographs carried was

substantially outweighed by their prejudicial effect. The State argues that the trial court acted within its discretion in admitting both photographs. We again agree with the State.

When the State sought to introduce the photographs at trial, defense counsel objected, offering to stipulate to the victim's identity and manner of death and arguing that the photographs were inflammatory and would have a devastating effect on the jury. The trial court overruled the objections, finding that the photograph of the victim alive was not prejudicial to the defendant and that the photograph of the victim deceased was neither gruesome nor inflammatory and its probative value outweighed its prejudicial effect.

The admissibility of photographs generally lies within the sound discretion of the trial court, and will not be overturned on appeal absent a showing that the trial court abused its discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). "Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases." State v. Morris, 24 S.W.3d 788, 810 (Tenn. 2000), cert. denied, 531 U.S. 1082, 121 S. Ct. 786, 148 L. Ed. 2d 682 (2001). In determining whether a photograph is admissible, the trial court must first determine whether it is relevant to a matter at issue in the case. See Tenn. R. Evid. 401; State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998), cert. denied, 526 U.S. 1071, 119 S. Ct. 1467, 143 L. Ed. 2d 551 (1999); Banks, 564 S.W.2d at 949. The court must next consider whether the probative value of the photograph is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ." Tenn. R. Evid. 403.

Notwithstanding defense counsel's offered stipulation, we agree with the State that the photographs were relevant to prove the identity of the victim as the man who was killed. See State v. Robinson, 146 S.W.3d 469, 491 (Tenn. 2004) (concluding that trial court did not err in allowing medical examiner to display victim's skull during his testimony, in spite of defense counsel's objection that it was not relevant to any disputed issue at trial) ("In a jury-out hearing the trial court carefully considered the defense objections, correctly summarized governing law regarding the prosecution's right to prove its case, and accurately concluded that this right may not be foreclosed by a defendant's characterization of the proof as undisputed or by a defendant's offer to stipulate or concede certain factual issues."); State v. Nesbit, 978 S.W.2d 872, 902 (Tenn. 1998) (appendix) (adopting this court's conclusion that family photograph of victim was relevant to establish his identity as murder victim). We further agree that the probative value of the photographs outweighs any prejudicial effect. As the trial court noted in its ruling, the photograph of the victim alive merely shows him standing outside with another man, while the morgue photograph, a black and white head shot of the victim with his eyes closed, appears to show a man either dead or merely asleep. We conclude, therefore, that the trial court did not abuse its discretion in allowing these photographs to be introduced into evidence at trial.

### IV. Questioning of Witnesses by Members of the Jury

The defendant next contends that the trial court erred by allowing jurors to ask direct questions of trial witnesses. Beginning with the first Spanish speaking witness and continuing

through the initial testimony of the second, the trial court allowed several jurors to ask direct questions through the interpreter in order to clarify confusing portions of the testimony. We note that the difficulty in understanding the translated testimony was compounded by counsel's apparently directing questions to the interpreter rather than the witness.

The defendant argues that by allowing the jurors to ask direct questions of the trial witnesses, the trial court violated the procedure mandated by Tennessee Rule of Criminal Procedure 24.1(c), lessened the State's burden of proof, and prejudiced the outcome of his trial. Recognizing that timely objections were not made at trial, the defendant requests that this court address the issue as plain error. The State argues that the defendant waived the issue by failing to object at trial, that the trial court's failure to comply with Rule 24.1(c) cannot be considered plain error because the rule did not take effect until after the defendant's trial, and that the trial court handled the matter in an appropriate manner under the circumstances, in which the Spanish speaking witnesses' testimony created an inordinate amount of confusion for the jurors.

A party's failure to make a contemporaneous objection to testimony at trial will generally result in a waiver of the issue on appeal. Tenn. R. App. P. 36(a); see also State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). However, where necessary to do substantial justice, an appellate court may take notice of a "plain error" not raised at trial if it affected a substantial right of the defendant. Tenn. R. Crim. P. 52(b); State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000). The following five factors are to be considered when deciding whether an error constitutes "plain error": (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice." State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994).

Tennessee Rule of Criminal Procedure 24.1, which took effect on July 1, 2003, provides in pertinent part:

> Juror Questions of Witnesses. – In the court's discretion, a juror desiring to propound a question to a witness may be permitted to do so. The juror must put the question in written form and submit it to the judge through a court officer at the end of a witness' testimony. The judge shall review all such questions and, outside the hearing of the jury, shall consult the parties about whether the question should be propounded. The judge, in his or her discretion, may ask the juror's question in whole or part and may change the wording of the juror's question before propounding it to the witness.
> . . .

Tenn. R. Crim. P. 24.1(c).

As the State points out, the rule did not become effective until after the defendant's May 2003 trial. Thus, the fact that the trial court did not comply with the procedure set forth above does not constitute a violation of a "clear and unequivocal rule of law." Furthermore, there is nothing to indicate that the defendant was prejudiced by the jurors' direct questions of the witnesses. The trial court first began allowing questions after the first juror, announcing his confusion, sought clarification from the court on which defendant Moreno was referring to in a portion of his testimony. After directing the interpreter to ask the witness the juror's question, the trial court instructed the jury to feel free to seek further clarification from the interpreter with respect to the "difficult" testimony. The jurors responded by asking only a few questions, most of which simply sought needed clarification on confusing points in the testimony. When the prosecutor expressed concern with the practice during the second Spanish speaking witness's testimony, the trial court immediately modified the procedure, requiring the jurors from that point forward to submit their questions in writing to the court at the conclusion of each witness's testimony.

The defendant specifically complains about one juror's having been allowed to ask Moreno what tone of voice the defendant used when ordering him to remove his shoes. He points out that the prosecutor had not asked the question up to that point, asserts he might never have asked the question, and contends that, had it not been asked, the defendant's culpable mental state "may not have been proven." However, the critical information showing the defendant's participation in the robbery, including the testimony about his having ordered Moreno to remove his shoes so he could see if Moreno had any concealed money inside them, had already been elicited by the prosecutor. Moreover, the juror's question occurred at the end of cross-examination, before the prosecutor had even begun his redirect examination. We, therefore, have no hesitation in concluding that any error in the juror's having elicited the information rather than the prosecutor was harmless. See Tenn. R. Crim. P. 52(a).

### V. Consecutive Sentencing

As his final issue, the defendant challenges the consecutive sentencing imposed by the trial court. He argues that the trial court erred in failing to issue any findings in support of its sentencing determination and contends that, given his youth and limited role in the crimes, the record does not support consecutive sentencing. The State concedes that the trial court did not make findings in support of consecutive sentencing, but argues that the defendant's extensive criminal history, based on the convictions in the case at bar, supports the imposition of consecutive sentencing.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing

Commission Cmts.; <u>Ashby</u> 823 S.W.2d at 169. In this case, the defendant has the burden of illustrating the sentence imposed by the trial court is erroneous.

The transcript of the sentencing hearing reveals that the trial court considered both the defendant's presentence report and the facts of the case before imposing the statutory presumptive sentence for each offense, with consecutive sentencing ordered for the second degree murder and aggravated robbery convictions. However, the trial court did not make any specific findings on the record in support of its imposition of consecutive sentencing.

Tennessee Code Annotated section 40-35-115 provides that a trial court may in its discretion impose consecutive sentencing when it finds any one of the following factors by a preponderance of the evidence:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
>
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;
>
> (6) The defendant is sentenced for an offense committed while on probation; or
>
> (7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b) (2003).

On appeal, the State has argued that the magnitude of the defendant's crimes in the present appeal justifies his receiving consecutive sentences. This court has held that consecutive sentencing may be ordered on this basis. See State v. Daryl Adrian Benjamin Ingram, No. W2002-00936-CCA-R3-CD, 2003 WL 721704, at *3 (Tenn. Crim. App. Feb. 26, 2003) ("A court may consider the offenses for which a defendant is being sentenced in determining whether the defendant has an extensive record of criminal activity."), perm. to appeal denied (Tenn. Sept. 2, 2003). However, since the record does not reflect that the trial court applied these holdings in determining that the defendant's sentences should be served consecutively, or did so for other reasons, we remand for the court to set out its reasons for consecutive sentencing.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court but remand for entry of corrected judgments as to Indictment No. 01-04380, which does not identify the code section of the offense of which the defendant was convicted; as to Indictment Nos. 01-04383 and 01-04384, which do not identify the offense of which the defendant was convicted; as to Indictment Nos. 01-04385 and 01-04386, which erroneously reflect the indicted offenses as first degree murder rather than attempted first degree murder; and as to Indictment No. 01-04389, which lists neither the code section nor the offense of which the defendant was convicted. Additionally, we direct that the trial court set out its reasons for consecutive sentencing.

_____
ALAN E. GLENN, JUDGE